## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

RONDIA K. MENDOZA,            :

          Plaintiff,            :
                                    Case No. 3:09CV0013

  vs.            :

                                    District Judge Thomas M. Rose

MICHAEL J. ASTRUE,            :            Magistrate Judge Sharon L. Ovington
     Commissioner of Social
     Security,            :

          Defendant.            :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

Plaintiff Rondia Mendoza filed an application for Supplemental Social

Security Income ["SSI"] benefits on March 5, 2004, claiming to have been disabled

since February 1, 2000.  (Tr. 52).  She alleges disability due to a "crush" injury to

her right arm, back problems, a learning disability, depression, high blood

pressure, high cholesterol, and breathing problems.  (Tr. 61).

Following initial denials of her application, Plaintiff was provided with an

administrative hearing (Tr. 396-429), after which Administrative Law Judge

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

["ALJ"] Melvin A. Padilla issued a written decision denying Plaintiff's application. (Tr. 12-26). ALJ Padilla based his decision on a conclusion that Plaintiff was not under a "disability" as defined by the Social Security Act. (Tr. 25). The ALJ's non-disability decision later became the Commissioner's final decision. Such decisions are subject to judicial review pursuant to 42 U.S.C. § 405(g), which Plaintiff is due in the present case.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #9), the administrative record, and the record as a whole.

## II.     BACKGROUND

Plaintiff was born in 1965 and, at 42 years old, was a "younger individual" when the ALJ issued his decision on February 20, 2008. (Tr. 24). She has a limited, eighth-grade education. (*Id.*). She last worked in 2000, as a packer in a food processing plant, full time for about six months. (Tr. 14, 400, 401).

During the September 17, 2007 hearing before the ALJ, Plaintiff testified that she was married but separated from her husband, who lived in Texas and maintained no contact with her. (Tr. 399). She lived in an apartment by herself, with welfare benefits and food stamps as her only source of income. (Tr. 399, 400). She had a driver's license and drove "maybe once a week." (*Id.*). She

indicated that in addition to her past job as a packer for Dole, she also had worked at nursing homes, doing laundry and housekeeping tasks. (Tr. 400-01). Plaintiff testified that she left the job at Dole when "I had a crying spell and I walked out" and was not permitted to return without counseling. (Tr. 416-17).

Asked how her current condition differed from that in previous unsuccessful applications for disability benefits, Plaintiff testified that "[m]y depression is getting worse." (Tr. 402). In addition to elaborating on symptoms and treatments related to her psychological issues (Tr. 402-04, 407-09), Plaintiff stated that problems with her right arm also prevent her from working. (Tr. 404). She indicated that a bone she had fractured "real bad" in that arm still had not healed, despite surgery in 1995. (Tr. 405).

Plaintiff is right handed. (Tr. 414). She said that her right arm was injured when a car accident "just crushed it and . . . broke half the bones in there." (*Id.*). She described "having trouble since" plates and screws were installed in that arm, and she had to have skin grafts. (*Id.*). "There's not much I can do with it. It's hard to explain." (*Id.*). She testified that her arm still swells and hurts "[e]very day," with "a sharp pain" that "goes all the way up to my shoulders." (Tr. 405, 415). Past physical therapy helped "[a] little bit," and injections in the arm also "eased the pain down." (Tr. 405-06). She testified that she had been

referred to a doctor in Columbus who "wanted to do surgery" on her arm, but "I got scared because I went in there on Friday, he wanted to do surgery on a Monday." (Tr. 406). According to Plaintiff, previous doctors had indicated that "no one wants to mess with it because they don't know how to put it back together," and she was told that "if I have surgery done . . . it can mess it up or I might not be able to ever use it again." (Tr. 415). She said that she did not plan to go through with any surgery "because I don't want to lose my arm." (*Id.*).

Plaintiff was treating her arm pain with Tylenol, but said that it did not help. (Tr. 406, 415). She also applied cold and hot patches. (Tr. 415). She denied any problems other than with her arm and her depression. (Tr. 406).

Questioned about physical limitations, Plaintiff testified that she could not lift any weight. (Tr. 411). She testified that she could brush her hair and dress herself, although "it takes me a while," and "I have a hard time with my left hand" when tying shoes. (*Id.*). She said that she still cooked for herself, washed dishes, swept, mopped, did laundry, made her bed, and sometimes went grocery shopping. (Tr. 411-12). On examination by her attorney, Plaintiff clarified that she used her left arm to sweep and mop, "then I have to sit down and rest." (Tr. 414-15).

Dr. Mary Eileen Buban, a psychologist appearing as a medical expert, and Brian Lee Womer, a vocational expert. also testified at the hearing. (Tr. 417-28). Dr. Buban's testimony was limited to an assessment of Plaintiff's mental health issues. (Tr. 417-424). Mr. Womer testified that Plaintiff's past relevant jobs all would be classified as unskilled medium work. (Tr. 424-25). Asked about a hypothetical person of Plaintiff's age, education and work experience, limited to a reduced range of light work [lifting no more than 20 pounds occasionally, 10 pounds frequently; no unprotected heights or climbing ladders or scaffolds; unskilled, simple, low stress tasks with no public contact, no production quotas and no fast pace; in a clean, temperature-controlled environment], Mr. Womer testified that such a person could do about 8,000 "light" jobs in the regional economy, or 2,000 "sedentary" jobs. (Tr. 425-26). With additional limitations of only occasional use of right hand controls and lifting only two pounds with the right upper extremity, the "light" jobs would be reduced to 3,000 and the "sedentary" jobs to 800. (Tr. 426). Adding a limitation of only occasional fine and gross manipulation of the right hand would reduce the "light" jobs to 2,500 the "sedentary" jobs to 500. (Tr. 428). Mr. Womer conceded that an individual unable to sustain attendance and absent up to three times a month could not maintain full-time employment. (*Id.*).

Turning to the remaining information in the administrative record, the most significant evidence for purposes of the issues raised on this appeal consists of Plaintiff's medical records and the opinions of medical sources relative to the physical impairment of Plaintiff's right arm.

*Hermann Hospital, Houston, Texas*  On September 17, 1995, Plaintiff sustained an open fracture of her right forearm when the car in which she was riding rolled over onto her arm.  (Tr. 303).  She underwent an open reduction and internal fixation of both bones in the right forearm.  (*Id.*, Tr. 309).  Several procedures were necessary to irrigate and debride the wound, as well as surgery to perform a skin graft.  (Tr. 303).  She was discharged from the hospital on October 7, 1995.  (*Id.*).

*Gregory S. Goings, M.D.*  Sometime before September 24, 2001, Dr. Goings, an orthopaedic surgeon, referred Plaintiff for electromyography ["EMG"] and nerve conduction testing, based on her complaints of sharp pain in her right arm. (*See* Tr. 119).  Physical examination revealed "[s]oft tissue deformity and scarring" of the right forearm, and "full" right upper arm strength, except that "right thumb IP active flexion" was absent.  (*Id.*).  Testing revealed distant right median nerve injury, but no right deep radial or ulnar neuropathy.  (Tr. 120).

On April 9, 2002, Dr. Goings reported that Plaintiff had returned after three months of using a bone growth stimulator to treat "a nonunion of the radius and the forearm." (Tr. 118). X-rays taken at that time indicated what appeared "to be some bone forming across the area of the nonunion." (*Id.*). Dr. Goings renewed Plaintiff's Darvocet prescription and recommended that she continue treating with the bone growth stimulator for another three months. (*Id.*).

Treatment notes dated July 11, 2002 indicate that the nonunion of Plaintiff's radius still had not healed. (Tr. 116). At that point, Dr. Goings remarked that "I feel that I don't have anything further to offer her." (*Id.*). He expressed reluctance to suggest surgery "on this arm which has had an extreme amount of trauma already," but pledged "to try to get her an appointment with a trauma and/or upper extremity specialist." (*Id.*). Handwritten notes indicate that his office referred Plaintiff to Dr. John Roberts on August 15, 2002. (*Id.*).

*John B. Roberts, M.D.* Dr. Roberts, an orthopaedic surgeon, examined Plaintiff on March 8, 2004. (Tr. 132). He reported that she had "some slight hypersensitivity to touch" over the healed area on her right forearm, as well as "decreased sensation in the superficial radial nerve distribution," although other nerves tested "intact." (*Id.*). Plaintiff had pain with range of motion in and stress of her right forearm, along with tenderness to palpation over the radius fracture,

but "no gross instability" of the forearm. (*Id*.). Because Plaintiff had "such a devastating soft tissue injury and multiple surgeries," Dr. Roberts was unsure how much of Plaintiff's pain was attributable to the radius fracture. (*Id*.). He referred her to Dr. Kevin Pugh to "evaluate her forearm and see if . . . her pain is coming from her forearm and if she does in fact have a nonunion." (Tr. 133).

*Kevin Pugh, M.D.* Dr. Pugh, Director of the Division of Orthopaedic Trauma at the Ohio State University Medical Center, examined Plaintiff on March 19, 2004. (Tr. 136). His review of Plaintiff's x-rays confirmed a "clear distinct nonunion of the radius." (Tr. 137). Dr. Pugh opined that Plaintiff "would best be treated with plate removal, debridement of her nonunion, and revision fixation." (*Id*.). He had consulted a plastic surgeon who indicated that operating through Plaintiff's prior muscle flaps "would probably be okay." (*Id*.). His report indicated that "informed consent was obtained," and that "[w]e will plan on getting her in the operating room in the reasonably near future." (*Id*.).

*Alex Tambrini, M.D.* Dr. Tambrini became Plaintiff's primary care physician on July 2, 2002. (Tr. 191). In a report prepared on or about April 4, 2004, he noted that among other problems, Plaintiff suffered from chronic right arm pain due to neurological damage from the crush injury in 1995. (*Id*.). He noted that the right arm had a large, eight inch by eight inch scar and a

deformity. (*Id*.). He also noted that Plaintiff had seen a surgeon in Columbus who "offered surgery" on Plaintiff's right arm, but that Plaintiff had "opted not to take the [risk]." (*Id*.). Dr. Tambrini opined that Plaintiff could not perform repetitive motions with her right hand, and suggested an independent evaluation to assess her functional impairment classification. (Tr. 192).

*William R. Kelley, M.D.* Dr. Kelley, an internist and state agency reviewing physician, reviewed the record on April 4, 2004. (Tr. 257-62). He determined that Plaintiff could perform light level work (*i.e.*, occasionally lift and carry up to 20 pounds, frequently lift and carry up to 10 pounds, and stand, sit and walk about six hours in an eight-hour workday). (Tr. 254, 259). With respect to Plaintiff's right arm, Dr. Kelley opined that she occasionally could use her right hand for hand controls and to lift up to two pounds. (Tr. 259-60).

## III.   ADMINISTRATIVE REVIEW

### A.   Applicable Standards

The term "disability" as defined by the Social Security Act carries a specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" that is

available in the regional or national economies.[2]  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  (*See* Tr. 19-32); *see also* 20 C.F.R. § 416.920(a).  Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920; *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

---

[2]Impairments also must be expected either to cause death or last 12 months or longer.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

**B.    The ALJ's Decision**

At Step 1 of the sequential evaluation, ALJ Padilla found that Plaintiff had not engaged in any substantial gainful activity since her claimed disability onset date of July 15, 2001.  (Tr. 15).  The ALJ found at Step 2 that Plaintiff has the severe impairments of depression/dysthymia; residuals of remote right arm injury; and obesity.  (*Id.*).

The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meets or equals the level of severity described in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 19).

At Step 4, the ALJ found that Plaintiff is capable of performing a reduced range of "light work" as defined for Social Security purposes, with restrictions of occasionally lifting 20 pounds and frequently lifting 10 pounds, but no more than two pounds with the right hand alone; no right hand controls or climbing ladders or scaffolds or working at unprotected heights; more than occasional kneeling or crawling; and simple, unskilled tasks and low stress jobs with no dealing with the public, no production quotas and no fast paced work, in a temperature-controlled, clean air environment.  (Tr. 20).

The ALJ further found that Plaintiff is unable to perform any of her past relevant work (Tr. 24), but found at Step 5 that Plaintiff could perform a

significant number of jobs in the national economy.  (*Id.*).  This assessment, along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for DIB or SSI.  (Tr. 25).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines:  whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria."  *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Bowen*, 478 F.3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of "'more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*.  *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  The required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or whether the administrative record contains evidence contrary to those findings.  *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*,

203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence."  *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *See Bowen*, 478 F3d at 746.  This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

V.    **DISCUSSION**

    A.    <u>**The Parties' Contentions**</u>

Plaintiff raises a single basis for challenging the Commissioner's decision, arguing that the ALJ erred by failing to recognize that "pain and other symptoms . . . prevent her from using her right upper extremity on a regular and continuing basis."  (Doc. #7 at 7).  Plaintiff urges that ALJ Padilla conducted neither a proper pain analysis nor the analysis necessary before rejecting a claim based on the claimant's failure to comply with recommended treatment.  (*Id.* at 7-10).

In response, the Commissioner argues that the ALJ properly considered Plaintiff's claims regarding limitations on use of her right arm but reasonably found her allegations to be not fully credible, and found her to be non-compliant with treatment. (Doc. #9 at 8-12). He therefore urges that the decision should be affirmed.

B.    <u>Subjective Symptoms/Credibility Assessment</u>

In many disability cases, the cause of the disability is not necessarily the underlying condition itself, but rather the symptoms associated with the condition. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). Where a disability claim is based on a claimant's symptoms and not the underlying condition, a two-part analysis is used to evaluate complaints of disabling pain. *Id.*; *see also* 20 C.F.R. § 416.929(a), *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001), *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir.1994). First, the ALJ will consider whether an underlying medically determinable physical impairment exists that reasonably could be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a); *see Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847 (6th Cir. 1986)). Second, if the ALJ finds that such an impairment exists, he then must evaluate the intensity, persistence and limiting effects of the symptoms on the individual's

ability to do basic work activities, considering all of the relevant evidence. *Jones,*
945 F.2d at 1366-70. Relevant factors for the ALJ to consider in his evaluation of
symptoms include the claimant's daily activities; the location, duration,
frequency, and intensity of symptoms; factors that precipitate and aggravate
symptoms; the type, dosage, effectiveness, and side effects of any medication
taken to alleviate the symptoms; other treatment undertaken to relieve
symptoms; other measures taken to relieve symptoms, such as lying on one's
back; and any other factors bearing on the limitations of the claimant to perform
basic functions. *Id.*

> Whenever a claimant's complaints regarding symptoms,
> or their intensity and persistence, are not supported by
> objective medical evidence, the ALJ must make a
> determination of the credibility of the claimant in
> connection with his or her complaints "based on a
> consideration of the entire case record." The entire case
> record includes any medical signs and lab findings, the
> claimant's own complaints of symptoms, any
> information provided by the treating physicians and
> others, as well as any other relevant evidence contained
> in the record. Consistency of the various pieces of
> information contained in the record should be
> scrutinized. Consistency between a claimant's symptom
> complaints and the other evidence in the record tends to
> support the credibility of the claimant, while
> inconsistency, although not necessarily defeating,
> should have the opposite effect.

*Rogers*, 486 F.3d at 247-48.

It is the province of the ALJ, not the reviewing court, to evaluate the credibility of witnesses, including the claimant. *Walters,* 127 F.3d at 531; *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir.1990). Nevertheless, the ALJ must articulate on the record the reasons for his negative assessment of a claimant's credibility.

## C.    Analysis

In summarizing Plaintiff's hearing testimony, the ALJ's complete statement regarding Plaintiff's experience of arm pain is as follows:

> The claimant said that she has right arm pain and had surgery for a broken bone in 1995. No surgery is currently recommended. She stated that the pain is daily and sharp all the way up the shoulder. She indicated that physical therapy helped a little bit and injections eased the pain. She saw a doctor in Columbus but could not recall his name. He wanted to do surgery too soon and she was scared.
>
> * * * She reported that she still has screws in her right arm; it had been crushed in the past in a motor vehicle accident. She said that she takes Tylenol and patches to help relieve the pain. . . She claimed that she cannot have surgery on the arm because they do not know how to put it back together. She does not anticipate having surgery.

(Tr. 15).

Based on the medical documentation, the ALJ found that "residuals of remote right arm injury" were among Plaintiff's severe impairments. (*Id.*). In finding that no listing was met or equaled by Plaintiff's impairments alone or in

combination, however, the ALJ did not even mention Plaintiff's right arm problems, instead focusing entirely on her mental status. (*See* Tr. 19-20). Then, in determining Plaintiff's residual functional capacity, the ALJ made only two fleeting references to the effects of Plaintiff's arm injury – first, in discounting Dr. Tambrini's 10 pound lifting restriction because "[h]e did not explain the lifting restriction and did not even mention her right arm condition among his cited impairments" (Tr. 20-21); and second, in simply acknowledging that "residuals of remote fracture of the right radius and evidence of nonunion of the fracture" was one of two severe physical impairments. (Tr. 21).

Nowhere in his RFC analysis did the ALJ specifically address Plaintiff's description of the ways in which her arm injury and the pain it causes impact her ability to function. Aside from a paragraph reciting Plaintiff's daily activities as being no more than "mildly" limited (*see* Tr. 23), the only comments by the ALJ that could be construed to pertain to his assessment of Plaintiff's pain and credibility relative to her arm injury would be the following, in their entirety:

> There is no evidence of significant adverse side effects to medication or other treatment that would warrant any further restriction to the residual functional capacity.
>
> Afer considering the evidence of record, the undersigned finds that while the claimant is credible to the extent of having "severe" impairments, her

> statements concerning the intensity, duration and
> <u>limiting effects of these impairments are not entirely
> credible.</u>
>
> Issues of credibility have been discussed above and
> while the claimant has "severe" impairments there is no
> substantial evidence of severity of such conditions
> consistent with disability. * * * She is noncompliant
> with just about all treatment in the record, whether
> physical or mental related, which undermines the
> credibility of her allegations.
>
> The claimant is found to be not credible on the issue of
> disability.

(Tr. 24) (emphasis in original).

Consistent with the foregoing excerpt, a thorough review of the ALJ's

decision reveals that he did not fully engage in the two-part analysis necessary to

properly evaluate complaints of disabling pain. *See Rogers*, 486 F.3d at 247-48; 20

C.F.R. § 416.929(a). There is little doubt that Plaintiff's "residuals of remote

fracture of the right radius and evidence of nonunion of the fracture," as

acknowledged by the ALJ (*see* Tr. 21), constitute "an underlying medically

determinable physical impairment" that reasonably could be expected to

produce pain. *See* 20 C.F.R. § 416.929(a). ALJ Padilla therefore was compelled to

evaluate the intensity, persistence and limiting effects of that pain on the

Plaintiff's ability to do basic work activities, considering all of the relevant

evidence. *Jones,* 945 F.2d at 1366-70. Despite his inclusion of a paragraph about

Plaintiff's daily activities, conspicuously absent was any discussion of Plaintiff's testimony that she could lift <u>no</u> weight with her right hand (Tr. 411), that she experienced some difficulty with such tasks as dressing herself and tying her shoes (*id.*), and that she was restricted to using only her left hand for sweeping and mopping. (Tr. 414-15).

In addition to that less than full consideration of Plaintiff's daily activities, the ALJ also failed to elaborate on other factors relevant to evaluating a claimant's symptoms – *i.e.*, the location, duration, frequency, and intensity of pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; or any other measures taken to relieve symptoms. *See Jones,* 945 F.2d at 1366-70. For example, while the ALJ correctly stated that there was "no evidence of significant adverse side effects" of any medication or other treatment used by Plaintiff to address her arm pain, he did not acknowledge Plaintiff's testimony that the Tylenol she was using did not relieve her pain. (Tr. 406, 415).

The ALJ also did not consider objective medical evidence, including "information provided by the treating physicians and others," that would tend to substantiate Plaintiff's alleged experience of pain. *See Rogers*, 486 F.3d at 247-48. The record demonstrates that Plaintiff was referred successively to a total of three

orthopaedists, one of whom termed her soft tissue injury "devastating" (Tr. 132), and one of whom confirmed that her broken radius never had healed completely and could be corrected only through extensive additional surgery. (Tr. 137). While the ALJ may have intended to allude to such additional surgery in determining that Plaintiff's "noncomplian[ce] with just about all treatment in the record . . . undermines the credibility of her allegations" (Tr. 24), the ALJ cited no medical basis in the record for discounting Plaintiff's stated fear of additional surgery due to concerns about whether her ability to use her arm might become even more impaired. (*See* Tr. 415). As a result, the Court concludes that ALJ Padilla did not comply with legal standards requiring him to must articulate on the record adequate reasons for his negative assessment of Plaintiff's credibility.

Although neither party specifically addresses whether such error may have been harmless, a review of the entire record in this matter does <u>not</u> compel a conclusion that "a different outcome on remand is unlikely." *See Wilson*, 378 F.3d at 546. Here, reasoned consideration of Plaintiff's subjective complaints of pain could have affected the ALJ's residual functional capacity assessment, which clearly could have impacted the types of jobs that Plaintiff was found able to perform.

## VI.    REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

In light of the finding that the ALJ made an error of law, remand of this matter to the Social Security Administration pursuant to Sentence Four is appropriate, to permit the ALJ to reassess Plaintiff's residual functional capacity. On remand, the ALJ should be directed to (1) re-evaluate Plaintiff's subjective complaints of pain and her credibility under the legal criteria set forth in the Commissioner's Regulations and Rulings, and as required by case law; and (2) reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for SSI. Accordingly, the case must be

remanded to the Commissioner and the ALJ under Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendations.

**IT THEREFORE IS RECOMMENDED THAT**:

1.  The Commissioner's non-disability finding be vacated;

2.  No finding be made as to whether Plaintiff Rondia Mendoza was under a "disability" within the meaning of the Social Security Act during the period of time at issue;

3.  This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4.  The case be terminated on the docket of this Court.

November 24, 2009                       __s/Sharon L. Ovington_____
                                            Sharon L. Ovington
                                        United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten [10] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen [13] days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten [10] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981).